## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| **Pierluigi Buccioli, Turn Invest Group Ltd,** Plaintiff, <br><br> v. <br><br> **DNC Holdings, LLC.,** a limited liability company; <br><br> **Solverde, SA**, a limited company <br><br> And <br><br> **the domain name <SolVerde.com> in rem.** <br><br> Defendants. | No. _____ <br><br> **COMPLAINT FOR DECLARATORY RELIEF** |

Plaintiff **Turn Invest Group Ltd** ("Plaintiff") alleges for Plaintiff's Complaint against Defendant **DNC Holdings, LLC** a limited liability company ("Registrar"), **Solverde, S.A.**, a limited company ("UDRP Complainant")(collectively "Defendants"), and **SolVerde.com** (the "Disputed Domain"), on personal knowledge as to Plaintiff's own activities and on information and belief as to the activities of others as follows:

## NATURE OF THE CONTROVERSY

1.  This action seeks declaratory relief pursuant to 15 U.S.C. § 1114(2)(D)(v) to establish that Plaintiff's registration and use of the domain name "**SolVerde.com**" (the "Disputed Domain") is not unlawful, and that Defendant has engaged in Reverse Domain Name Hijacking, under the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).

1.  This action arises from **Solverde, SA** (the "UDRP Complainant") actions to obtain the Disputed Domain from Plaintiff after Plaintiff was the successful bidder in an expired domain name auction.

1

2.     The Domain Name **Solverde.com** has been suspended by the Registrar and is at immediate risk of being transferred away from Plaintiff by, and as a result of, the actions of UDRP Complainant, which claims trademark rights and certain other rights with respect to the term and the domain name **Solverde.com**.  The Plaintiff seeks a determination by this court that the Plaintiff's registration and/or use of **Solverde.com** is not, and has not been in violation of the ACPA, and that Plaintiff's use of **Solverde.com** constitutes neither an infringement of UDRP Complainant's purported trademark nor a violation of the ACPA.

### THE PARTIES

3.     Plaintiff is a limited liability company registered under the laws of the country of the Seychelles and has its address at Global Gateway 8 Rue de la Perle Providence, Grand Anse Mahe Mahe, Seychelles.

4.     Upon information and belief, defendant Solverde, SA ("Defendant") is a Portuguese public limited company with an address at Rua 19, n.º 85, 4500-256 Espinho, Portugal.

5.     On information and belief, Plaintiff alleges that the Disputed Domain is registered by DNC Holdings, Inc. and that DNC Holdings, Inc. is the owner and operator of Directnic, LLC (doing business as Directnic.com) which is an ICANN accredited registrar incorporated in Delaware with an office at 3618 W. Horatio Street, Tampa, FL 33609 ("Registrar").

6.     The Defendant Domain Name, **SolVerde.com** (hereinafter "Disputed Domain Name") is under the control of the Registrar, which is located in this jurisdiction.

## REGISTRAR AND AUCTIONEER INFORMATION

7.  On information and belief the Disputed Domain has remained under the control of the Registrar since 2002, when the original registrant registered the Disputed Domain.

8.  On information and belief, Plaintiff alleges that after the original registrant allowed the Disputed Domain to expire, and UDRP Complainant chose not to pay the $10.00 to renew the registration, the Disputed Domain expired and was sold through a public domain name auction run by NameJet.

9.  On information and belief, NameJet is a Florida corporation, with a principal office at 5335 Gate Parkway, Jacksonville, FL 32256 ("Auctioneer").

## UDRP COMPLAINANT INFORMATION

10. On information and belief, Plaintiff alleges that Solverde, SA ("UDRP Complainant") is a Portuguese public limited company with an address at Rua 19, n.º 85, 4500-256 Espinho, Portugal.

11. On information and belief, UDRP Complainant operates multiple casino hotels throughout Portugal, and advertises its hotel, casino, and vacation offerings through its current domain name <grouposolverde.pt>, and through third-party online travel booking providers advertise and solicit citizens from this jurisdiction and throughout the United States more generally.

12. On information and belief, Plaintiff alleges that UDRP Complainant is a legal entity that actively offers lodging and both onsite and online gambling goods/services for sale in the United States to United States citizens and residents, including within the State of Florida, by, among other things, offering (a) hotel related services for US residents

visiting UDRP Complainant's hotels and casinos in Portugal and (b) online gambling services for US residents.

13.  On information and belief, Plaintiff alleges that on or about June 16, 2016, UDRP Complainant announced it was entering into a partnership arrangement with a third party to collectively provide online gambling services in the United States and/or to US residents, including residents within the State of Florida.

14.  On information and belief, Plaintiff alleges that UDRP Complainant undertook the actions complained of herein, including the filing and prosecution of the UDRP proceeding as alleged herein with full knowledge that such undertaking would impact Plaintiff's domain name which was at the time registered and existing in the United States.

15.  On information and belief, Plaintiff alleges that UDRP Complainant undertook the actions complained of herein with full knowledge and intention to interfere with and disrupt Plaintiff's ownership of the Disputed Domain which was the result of an auction that occurred in the United States..

## JURISDICTION AND VENUE

16.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.§1331, 15 U.S.C. §1114(2)(D)(v), and 28 U.S.C. §2201 that Plaintiff's registration and use of the Disputed Domain is not unlawful under the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d) and UDRP Complainant has engaged in Reverse Domain Name Hijacking.

17.    This Court has personal jurisdiction over UDRP Complainant because UDRP Complainant actively sells and promotes its services to Americans located in the United States and within the jurisdiction of this court.

18.    Registrar operates its domain name registration and hosting business in Tampa, Florida, and Metairie, Louisiana.

19.    Auctioneer sells domain names via its auction platform with a principal place of business at 5335 Gate Parkway, Jacksonville, Florida.

20.    Venue is proper in this District under 28 U.S.C. §1391(b)(2). A substantial part of the property that is subject of this action is situated in this District.

21.    The Disputed Domain has situs in this District within the meaning of 15 U.S.C.§1125(d)(2)(C).   The Registrar holds and controls the Disputed Domain in this District.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

22.    This case involves "reverse domain name hijacking," which occurs when an individual or an entity alleges that it is the owner of a trademark and asserts spurious claims of trademark infringement against the owner of a domain name which is similar or identical to the registered trademark. UDRP Complainant is attempting to wrest control of the Disputed Domain by asserting misleading, and baseless allegations of trademark infringement and cybersquatting.

23.    Among other businesses, Plaintiff has been investing in generic, non-infringing, notable, and/or descriptive domain names, such as the Disputed Domain.   Plaintiff does so for re-sale to third parties seeking to purchase domain names for their businesses, whether they are existing or startups.

5

24.   Plaintiff has been registering, developing, and selling common word and notable domain names for investment and development purposes.

25.   On information and belief, Plaintiff alleges that the Disputed Domain Name was first registered on or about November 27, 2002, and was owned by the same original registrant until on or about November 27, 2020, after which it expired.

26.   On information and belief, Plaintiff alleges that from the date of registration through and including November 26, 2020, the Disputed Domain Name resolved to an "under construction" page that portrayed no content other than the following: : **Páginas em Construção - Pages under Construction Pages en Construction - Páginas en Construcción E-mail:** info@solverde.com

27.   On information and belief, Plaintiff alleges that on or about November 23, 2020, UDRP Complainant filed a Uniform Dispute Proceeding ("UDRP") with the World Intellectual Property Organization ("WIPO").  WIPO, as the dispute resolution provider was responsible for communicating with UDRP Complainant and the Registrar during the pendency of the UDRP proceeding.  This proceeding is referenced hereinafter as the "Original UDRP Complaint."

28.   On information and belief, Plaintiff alleges that together with the Original UDRP Complaint, UDRP Complainant filed Annexes, including Annex 1, which showed that the registration of the Disputed Domain was to expire on November 26, 2020.

29.   On information and belief, Plaintiff alleges that at the time the Original UDRP Complaint was filed, the registrar of the Disputed Domain was Directnic.com, the Registrar named in this action.

30.   On information and belief, Plaintiff alleges that following the filing of the Original UDRP

Complaint, WIPO advised the Registrar, via email, that the Disputed Domain was the subject of a UDRP Proceeding and requested that the Registrar lock the Disputed Domain to prevent further transfer.

31. On information and belief, Plaintiff alleges that in response to such advisement by WIPO, the Registrar advised WIPO of certain information regarding the Disputed Domain, including, without limitation, the expiration date of the Disputed Domain.

32. On information and belief, Plaintiff alleges that the expiration date – the date upon which the current registration would expire – was November 27, 2020, and that such information was publicly known and available by way of a common "WHOIS" search and in fact known to Defendant at the time of Defendant's filing the Original UDRP Complaint.

33. On information and belief, Plaintiff alleges that during the pendency of the UDRP, WIPO and UDRP Complainant were advised of the expiration of the Disputed Domain by the Registrar.

34. On information and belief, Plaintiff alleges that during the pendency of the UDRP, and having been advised by the Registrar regarding the expiration of the Disputed Domain, the UDRP Complainant was provided with the opportunity to pay the registration renewal fee for the Disputed Domain and thus preserve the registration of the Disputed Domain, the ultimate ownership of which would have been determined by the WIPO arbitration panel pursuant to the Original UDRP Complaint.

35. On information and belief, Plaintiff alleges despite being placed on notice, the UDRP Complainant failed and refused to pay the registration renewal fee of $10.00.

36. On information and belief, had UDRP Complainant renewed the Disputed Domain, the Disputed Domain would not have been sent to the Auction.

37.     On information and belief, Plaintiff alleges that the registration of the Disputed Domain expired on or about November 26, 2020.

38.     On information and belief, Plaintiff alleges that following expiration, and as permitted by the registration agreement governing registration of the Disputed Domain, the Registrar took control over the Disputed Domain and displayed pay-per-click advertisements thereon.

39.     On information and belief, Plaintiff alleges that following expiration, and as permitted by the registration agreement governing registration of the Disputed Domain, the Registrar placed the Disputed Domain for sale using NameJet.com, the Auctioneer, as the auction house, and it was listed for sale at public auction.

40.     On or about January 4, 2021, the Disputed Domain was sold at the Auction to the Plaintiff.

41.     Plaintiff was the winning bidder in the Auction and purchased the Disputed Domain for the sum of $665.00.

42.     On information and belief, Plaintiff alleges that 21 separate bidders competed to purchase the Disputed Domain during the course of the Auction.

43.     Plaintiff purchased the Disputed Domain solely because it is a valuable, notable .COM domain name with inherent value, which Plaintiff thought Plaintiff could develop, sell to a third-party end user, or resell on the secondary investment market, including, but not limited to, companies that are interested in "green" renewable energy projects.

44.     At that time, and to this day, UDRP Complainant does not have a trademark registration in the United States.

45.     Plaintiff thought the Disputed Domain was an attractive name because it was an expired domain name that appeared to have been active since at least 2002, had never been used to

portray a website, and appeared to be a generic/descriptive and notable name, similar to other domain names that Plaintiff has registered and sold.

46. The Disputed Domain has a meaning and is comprised of the word "sol" – meaning "sun" in Spanish, combined with the word "verde" – meaning "green" in Spanish. Although the translated version of the Disputed Domain would literally be "SunGreen.com", Plaintiff was aware that in Spanish, the adjective is preceded by the noun such that it would be the equivalent as "GreenSun.com." Combined, the term "green sun" has obvious connotations for such things as renewable energy including solar power. Indeed, at the time of the auction, Plaintiff was aware of at least one large solar energy project in California that used the term "Solverde" in reference to renewable energy.

47. As in the instant matter, Plaintiff regularly reviews the Auctioneer's, GoDaddy's and other public domain name auctions for interesting and notable domain names that Plaintiff believes are valuable. After seeing that the Disputed Domain was expired because the prior registrant failed to renew the registration, Plaintiff thought this would be a good investment.

48. Plaintiff registers common word domain names because they best fulfill the purpose of a domain name which is to be easy to remember. Common word and "descriptive" domains serve well online and, as a result, are commercially valuable.

49. Over the past ten years, Plaintiff has registered other short and memorable .com domain names, similar to the Disputed Domain, including but not limited to: **GreenValleyEnergy.com,        SpinGreen.com,        GreenParkMedia.com, GreenViewCapital.com, ItaliaVerde.com; BancaVerde.com; and SolVest.com,** all of which contain similar notable terms that are inherently descriptive or generic.

50. At the time Plaintiff registered the Disputed Domain, as he was not located in Portugal, he

had no knowledge of the UDRP Complainant.   As such, Plaintiff did not register, and could not have registered the Disputed Domain with Complainant's purported trademark in mind or with the intent to sell to Complainant, to disrupt Complainant's business, or to confuse consumers seeking to find Complainant's web site.

51.     Contrary to the claims of UDRP Complainant, Plaintiff was not aware of Complainant or Complainant's alleged Portuguese trademark when it was bidding to purchase the Disputed Domain at Auction.

52.     At no time did Plaintiff target or intend to target the UDRP Complainant or its alleged Portuguese trademark and Plaintiff did not use the Disputed Domain in an infringing manner.   Between the time of the purchase of the Disputed Domain and the receipt of the Amended UDRP Complaint (described below), there were no communications between Plaintiff and the UDRP Complainant.

53.     In continuing Plaintiff's business of domain name investing and development for over a decade, Plaintiff has relied on decisions of numerous UDRP panels that have found that this (and many other similar companies) investment strategy of domain registration and use is a legitimate business activity.

54.     Plaintiff is informed and believes and based thereon alleges that UDRP Complainant was advised by WIPO via email in January 2021 that Plaintiff had acquired the Disputed Domain through public action on or about January 4, 2021.

55.     Although having been so advised on or about January 2021, UDRP Complainant waited until on or about March 1, 2021, to file an "amended" complaint in connection with the UDRP ("Amended UDRP Complaint").   The new filing was merely titled "Complaint" and not "Amended Complaint" and did not reference the prior filing or clearly specify that there

was a procedural history of the UDRP.

56.     Through the "Amended" UDRP Complaint, UDRP Complainant improperly continued its UDRP by merely swapping out the original registrant and substituting Plaintiff as the new respondent.  UDRP Complainant sought an order to transfer the ownership rights of the Disputed Domain to UDRP Complainant.

57.     In its "Amended" UDRP Complaint, UDRP Complainant asserted exclusive global rights to "Sol Verde" because of its alleged trademarks, which were registered only in Portugal.

58.     UDRP Complainant merely alleged that the Disputed Domain was identical (excluding the .com extension) to its Portuguese trademark.  UDRP Complainant never alleged in the UDRP that the Disputed Domain created confusion as to consumers.

59.     UDRP Complainant alleged that Plaintiff lacked any legitimate interest because (a) the UDRP Complainant's Portuguese trademark pre-dated the first (2002) registration of the Disputed Domain, (b) Plaintiff did not hold a trademark registration for the Disputed Domain, (c) the Disputed Domain did not correspond to Plaintiff's name, and (d) the Disputed Domain did not resolve to a website containing any traditional content.

60.     UDRP Complainant alleged that Plaintiff acted in bad faith because Plaintiff's acquisition was "speculative" and Plaintiff should have known of its alleged Portuguese trademarks, although UDRP Complainant provided no evidence of the notoriety of its alleged Portuguese trademarks other than copies of registration and copies of its own website.

61.     UDRP Complainant misleadingly alleged that Plaintiff's acquisition was somehow improper and that any bad faith on the part of the Disputed Domain's prior registrant (named in the Original UDRP Complaint) be attributable to Plaintiff.

62.   UDRP Complainant did not include ANY information about an original UDRP Complaint against the original registrant, nor did it give any indication that there was a pending UDRP Action.

63.   UDRP Complainant made these claims despite knowing at the time it filed the Amended UDRP Complaint that:

(a) UDRP Complainant had been advised by the Registrar and WIPO of the original expiration date of the Disputed Domain;

(b) UDRP Complainant had been provided with the opportunity to pay the registration fee for the Disputed Domain and thus prevent expiration;

(c) the Disputed Domain had in fact expired;

(d) UDRP Complainant was aware that the UDRP Complaint should have been dismissed by WIPO upon the expiration of the Disputed Domain;

(e) UDRP Complainant had been advised that the Disputed Domain Name had been sold at a public auction to a new owner.

64.   At the time Plaintiff filed its response to the UDRP Complaint, Plaintiff had no knowledge of the prior UDRP action filed by UDRP Complainant.

65.   Plaintiff is informed and believes and based thereon alleges that the publicly available policy of ICANN regarding the expiration of domain names is set forth in the ICANN Registrar Accreditation Agreement (https://www.icann.org/resources/pages/ra-agreement-2009-05-21-en) and that such agreement specifies that a UDRP complainant has the ability to preserve the registration of an otherwise expiring domain name by payment of the normal registration fee:

"3.7.5.7 In the event that a domain which is the subject of a UDRP dispute is deleted or expires during the course of the dispute, the complainant in the UDRP dispute will have the option to renew or restore the name under the same commercial terms as the registrant. If the complainant renews or restores the name, the name will be placed in Registrar HOLD and Registrar LOCK status, the WHOIS contact information for the registrant will be removed, and the WHOIS entry will indicate that the name is subject to dispute. If the complaint is terminated, or the UDRP dispute finds against the complainant, the name will be deleted within 45 days. The registrant retains the right under the existing redemption grace period provisions to recover the name at any time during the Redemption Grace Period, and retains the right to renew the name before it is deleted."

66.   Plaintiff is informed and believes and based thereon alleges that in the event that the complainant in such a UDRP fails or refuses to pay such renewal registration fee, the domain name will expire under the normal set of events.

67.   Plaintiff is informed and believes and based thereon alleges that the Registrar, in its publicly available terms and conditions, expressly permits third parties (those other than the registrant) to pay registration renewal fees for a domain name under what it terms the "Easy Renew" program.

68.   Plaintiff is informed and believes and based thereon alleges that although UDRP Complainant was timely advised of the pending expiration of the Disputed Domain, and although UDRP Complainant had the opportunity to pay such registration renewal fee, it failed or refused to pay the registration renewal fee.

69.   Plaintiff is informed and believes and based thereon alleges that as a result of UDRP Complainant's failure or refusal to pay the registration renewal fee, the Disputed Domain expired and was properly placed for public auction. UDRP Complainant's filing of the Administrative Proceeding was itself in bad faith because it knew that a third-party (the original owner of the Disputed Domain) had owned and used the Disputed Domain since 2002, that such use had presented no conflict with UDRP Complainant's alleged

13

Portuguese trademark, and UDRP Complainant had taken no action to acquire the Disputed Domain by way of (a) purchase from the original owner; (b) payment of the $10.00 registration renewal fee to prevent expiration; or (c) participation in the public Auction.

70. Plaintiff is informed and believes and based thereon alleges that instead of accurately describing the procedural history and subsequent events leading to Plaintiff's acquisition of the Disputed Domain, UDRP Complainant intentionally lead the WIPO to believe that the case was one of intentional cyber-flight and that Plaintiff was a willing participant in same.

71. Moreover, UDRP Complainant's alleged "Sol Verde" trademark is not famous or well-known, let alone distinctive.  Indeed, UDRP Complainant ostensibly admitted that its trademark was not well known outside of Portugal because it limited such notoriety to being within Portugal.  Such trademark is not a "trademark" for the purposes of the ACPA.

72. The WIPO proceeding resulted in decision, *Solverde, S.A. v. Rojas Espinoza, Servicios de Lexicografia S.A. / Pierluigi Buccioli, Turn Invest Group Ltd*, Case No. D2020-3138.

73. Therein the panel issued a deeply flawed and unprincipled decision.  The panel not only disregarded Plaintiff's sworn declaration and other evidence of good faith, but rather based its decision primarily on a clearly erroneous assumption that Plaintiff should have known about the previously filed UDRP Complaint against the original registrant despite the fact that this information had never been disclosed to the Plaintiff by the UDRP Complainant or WIPO.  By basing its decision on that erroneous assumption, it ignored settled UDRP jurisprudence to create not only a highly prejudicial decision, but it also created a new

14

obligation upon all purchasers of domain names to engage in research to determine if there are any unpublished pending disputes involving the domain name.

74. Upon information and belief, Plaintiff alleges that the panel created this new law to achieve a pre-determined outcome based on its biases against domain name investors.

75. Upon information and belief, no previous purchaser of domain names has been held to this new standard.

76. None of UDRP Complainant's underlying UDRP complaint assertions were supported by sworn statements.

77. The WIPO panelists improperly ignored the evidence in the record that established Plaintiff's legitimate purpose for the Disputed Domain and ignored without comment the fact that Plaintiff has submitted a sworn declaration. Rather, they accepted the UDRP Complainant's baseless assertions which were not supported by any evidence or sworn statements.

78. Perhaps most glaringly, in their desire to create new law, the WIPO Panelists created their own narrative, instead of following the facts and chose to support suspicions to achieve the "desired" result to transfer the Disputed Domain to UDRP Complainant. In so doing, they had to disregard evidence that:

- The Disputed Domain was registered and in use by a third-party since 2002;

- UDRP Complainant does not have a famous or well-known trademark (outside of Portugal) and did not even attempt to allege as much in its UDRP Complaint;

- UDRP Complainant had never attempted to acquire the Disputed Domain even though it had been registered and unused since 2002;

- From the date of registration through the date of expiration, the Disputed Domain had resolved to an "under construction" page that contained no content that conflicted with any trademark rights held by UDRP Complainant;

- The UDRP Complainant had not paid the registration renewal fee of $10.00;

- The registration of the Disputed Domain had in fact expired during the pendency of the UDRP;

- The Disputed Domain was auctioned in a public auction by Namejet.com;

- UDRP Complainant could have, but did not participate in the auction;

- Plaintiff was the successful bidder at the auction and rightfully acquired the Disputed Domain;

- Plaintiff submitted a declaration under penalty of perjury that he resided in the United Kingdom and had not been aware of the UDRP Complainant or its alleged Portuguese trademarks prior to acquiring the Disputed Domain at the Auction; and,

- Plaintiff had registered other similar domain names containing combinations of verde and sol which strongly supported Plaintiff's interest in registering the Disputed Domain and Plaintiff's stated rationale for registering it.

79. Instead of following settled UDRP jurisprudence, the panelists determined that Plaintiff must have targeted UDRP Complainant's trademark in registering the Disputed Domains without a single shred of evidence in the record to support such a finding.

80. The order to transfer the Disputed Domain, was based on the UDRP Complainant's misleading claims and omission of key information that would have alerted Plaintiff to full factual history.

81. Fundamental errors made by the WIPO panelists, in reliance on UDRP Complainant's misrepresentations, deprived Plaintiff of natural justice and due process of law. As a result, Plaintiff initiated the instant action to prevent transfer of the Disputed Domain.

82. Plaintiff registered the Disputed Domain in good faith for a legitimate purpose.

83. Plaintiff's intended use of the Disputed Domain is substantiated by Plaintiff's more than twelve (12) years investing in similar domain names.

84. The Disputed Domain is locked and does not currently resolve and is neither targeting UDRP Complainant nor is Plaintiff using the Disputed Domain in an infringing manner in anyway.

85. The UDRP decision was published on June 1, 2021.

86. Plaintiff is informed and believes, and based thereon alleges that unless it files an action within ten (10) business days of the date of publication, the Disputed Domain will be transferred by the Registrar to the UDRP Complainant.

87. Should such transfer occur, Plaintiff will suffer substantial loss of the Disputed Domain.

88. Plaintiff seeks this Court's protection to determine that Plaintiff legitimately bought an essentially generic non-infringing domain name in open market using a legal and well-established means of buying domain names – the public expired domain name auction process, and is now to be deprived of that property because a trademark owner who could have participated in that Auction, and either appears not to have done so or may have unsuccessfully bid on the Disputed Domain through a proxy, to steal the asset from Plaintiff based upon an improperly decided UDRP claim founded on mere "suspicion".

89. At no point did Plaintiff offer the Disputed Domain for sale to UDRP Complainant, target UDRP Complainant, or act in bad faith in any manner.

## COUNT ONE

## Declaratory Relief – 28 U.S.C. § 2201

## No Violation of Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)

90.   Plaintiff realleges and incorporates all previous paragraphs as though fully set forth herein.

91.   An actual controversy exists about whether Plaintiff should be entitled to the domain name **SolVerde.com** under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).

92.   The Anticybersquatting Consumer Protection Act provides a cause of action for a registrant whose domain name has been suspended, disabled, or transferred under which the registrant may sue for a declaration that the registrant is not in violation of the ACPA and for injunctive relief, including the reactivation of the domain name.

93.   Under 15 U.S.C. §1114(2)(D)(v), a registrant who is threatened with the loss of Plaintiff's domain name under the UDRP has a cause of action to seek an injunction returning the domain name if the registrant can show that the registrant is in compliance with the ACPA.

94.   UDRP Complainant does not have any exclusive use of the trademark, nor did it have such a right at the time Plaintiff registered the Domain Name.

95.   In registering the Disputed Domain, Plaintiff did not have a bad faith intent, as provided in 15 U.S.C. §1125(d)(1)(A)(i), to profit from any mark alleged to be owned by UDRP Complainant.

96.   In registering the Disputed Domain, Plaintiff did not have the intent, as provided in 15 U.S.C. §1125(d)(1)(B), to divert consumers from UDRP Complainant's online location to a site accessible under the Disputed Domains that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by

18

creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site.

97.     In registering the Disputed Domain, and at no time since registration, has Plaintiff offered to transfer, sell, or otherwise assign the Disputed Domain to UDRP Complainant for financial gain without having used, or having an intent to use, the Disputed Domain in the bona fide offering of any goods or services, nor is there prior conduct by Plaintiff indicating a pattern of such conduct.

98.     Plaintiff has not registered or acquired multiple domain names that it knows are identical or confusingly similar to marks of UDRP Complainant or others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties.

99.     Plaintiff has not registered, trafficked in, or used a domain name that at the time the Disputed Domain was registered was identical or confusingly similar to any mark alleged to be owned by UDRP Complainant.

100.    Plaintiff believed and had reasonable grounds to believe that its registration of the Disputed Domain was lawful and relied on extensive UDRP jurisprudence that such registration and use of a domain name is permissible and which recognizes that domain name investing is a legitimate interest under the UDRP.

101.    As required by 15 U.S.C. §1114(2)(D), Plaintiff has given notice to UDRP Complainant of its intent to file an action to establish that Plaintiff's registration and use of the Disputed Domain is not unlawful under the ACPA.

## COUNT TWO
## Declaratory Judgment

102. Plaintiff realleges and incorporates all previous paragraphs as though fully set forth herein.

103. A dispute exists between Plaintiff and UDRP Complainant concerning Plaintiff's right to register and use the Disputed Domain. As a consequence of the dispute, an actual and justiciable controversy exists between Plaintiff and UDRP Complainant.

104. Plaintiff's use of the Domain Name is not likely to cause confusion or mistake, or deceive as to the affiliation, connection, or association of Plaintiff with UDRP Complainant, or as to the origin, sponsorship, or approval of UDRP Complainant.

105. UDRP Complainant's acts make this an exceptional case under 15 U.S.C. §1117(a), and Plaintiff is thus entitled to an award of attorney's fees and costs.

## COUNT THREE
## Reverse Domain Name Hijacking

106. Plaintiff realleges and incorporates all previous paragraphs as though fully set forth herein.

107. UDRP Complainant initiated and/or maintained the UDRP proceeding against Plaintiff in a bad faith attempt to deprive Plaintiff of the Disputed Domain after UDRP Complainant failed to renew the Disputed Domain for $10.00, despite being given the opportunity to do so. Instead, UDRP Complainant filed a misleading claim designed to wrest the Disputed Domain from Plaintiff after Plaintiff purchased the Disputed Domain at the Auction.

108. Indeed, Plaintiff never used the Disputed Domain for commercial gain or to target UDRP Complainant or UDRP Complainant's trademark. Moreover, suspicion that Plaintiff "must have been aware" of UDRP Complainant's alleged Portuguese trademarks does not support

an inference of bad faith registration or use – actual intent, based on a knowing intent to target a trademark with abusive cybersquatting, is required.

109.   Under the UDRP rules, UDRP Complainant had a duty to certify that the information contained in its "Amended" UDRP Complaint and in its responses to any procedural orders were, to the best of their knowledge, complete and accurate.

110.   Instead, UDRP Complainant knowingly provided the WIPO panel with pleadings that were based on mere suspicion, and which presented false, incomplete and misleading claims concerning the facts and its bad faith scheme to gain control over the Disputed Domain.

111.   At no point in time prior to the UDRP decision did the UDRP Complainant, the Registrar, or WIPO notify the Plaintiff that there was a prior UDRP complaint filed by UDRP Complainant.

112.   The WIPO Panel erroneously found for the UDRP Complainant in the UDRP proceeding- and ordered the transfer of the Disputed Domain Name to UDRP Complainant.

113.   Panelists created new "law" by erroneously concluding that Plaintiff had an obligation to engage in burdensome research to determine on its own that there was a prior UDRP complaint filed on the domain name.

114.   Panelists further made an erroneous assumption, based in part on the prior UDRP Complaint, that Plaintiff must have known that UDRP Complainant existed before Plaintiff purchased the Disputed Domain at Auction.   This conclusion not only ignores the facts, but it was also not specifically alleged by UDRP Complainant.

115.   There was no evidence submitted (or even an allegation) that attempted to connect Plaintiff to the prior registrant such that the actions of the prior registrant should be inferred to be those of the Plaintiff.   Nor were there allegations that Plaintiff acted in collusion with the

prior registrant to avoid the potential implications of the Original UDRP Complaint. Elevating baseless suspicions or their own internal biases is not a basis for a WIPO panel to decide a claim.

116.   It is clear that the Panel was influenced by UDRP Complainant's misrepresentations and possibly their own bias against domain name investing.

117.   It is equally clear that UDRP Complainant disregarded clear evidence of the validity of Respondent's rights and persisted with its "Amended" UDRP Complaint in bad faith as a "Plan B" response after it realized the error of not having paid the $10.00 registration renewal fee or of not having participated in the public auction.

118.   It is also clear that the Panel was influenced by the misinformation and misleading information presented and chose to ignore the evidence of third-party use of the term Sol Verde, including but not limited to numerous green energy projects such as the Sol Verde solar energy project in California.

119.   UDRP Complainant's misleading claims and WIPO's failure to terminate the original UDRP Complaint when the Disputed Domain expired lead to the Panel making negative inferences against Plaintiff, which placed the Disputed Domain at risk and wrongfully impugned the reputation of Plaintiff – a party that merely purchased the Disputed Domain at public auction.

120.   The ACPA establishes a right of relief against an overreaching trademark owner seeking to take ownership of domain names that have not been registered or used in violation of the trademark owner's rights. This practice is called "reverse domain name hijacking."

121.   The Internet Corporation for Assigned Names and Numbers ("ICANN"), the organization responsible for promulgating the UDRP, defines reverse domain name hijacking as "using

the Policy in bad faith to attempt to deprive a registered domain-name holder of a domain name."

122.   15 U.S.C. §1114(2)(D)(iv) and (v) state the following:

>   **(iv)** If a registrar, registry, or other registration authority takes an action described under clause (ii) based on a knowing and material misrepresentation by any other person that a domain name is identical to, confusingly similar to, or dilutive of a mark, the person making the knowing and material misrepresentation shall be liable for any damages, including costs and attorney's fees, incurred by the domain name registrant as a result of such action. The court may also grant injunctive relief to the domain name registrant, including the reactivation of the domain name or the transfer of the domain name to the domain name registrant.
>
>   **(v)** A domain name registrant whose domain name has been suspended, disabled, or transferred under a policy described under clause (ii)(II) may, upon notice to the mark owner, file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter. The court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant.

123.   Plaintiff's registration and use of the Disputed Domain is not unlawful under the ACPA and therefore Plaintiff has every right to possess and maintain this valuable business asset.

124.   The fact that a WIPO panel ordered the transfer of the Disputed Domain to UDRP Complainant is of no import in this case. The UDRP decision is due no deference in this Court, which must perform a *de novo* review of the allegations herein presented.

125.   UDRP Complainant presented in its UDRP "Amended" Complaint the unsupported assertion that Plaintiff had no legitimate interest in the Disputed Domain. On the contrary, Plaintiff's verifiable activities to date not only demonstrate Plaintiff's legitimate interest in the Disputed Domain, but they prove by clear and convincing evidence that Plaintiff has no intention of using the Disputed Domain for an improper purpose.

126.   UDRP Complainant knowingly misrepresented or omitted facts in its UDRP Complaint.

127.   The assertion of UDRP Complainant's trademark rights went far beyond claims

of infringement or confusing similarity, to brand *any* conceivable use of the Disputed Domain to be illegitimate.

128. UDRP Complainant presented in its UDRP "Amended" Complaint the unsupported assertion that Plaintiff registered the Disputed Domain to target UDRP Complainant's trademark.

129. UDRP Complainant knew that all of the above assertions were patently false when it submitted them to the WIPO panel. However, UDRP Complainant desired to possess the Disputed Domain for its own purposes, and its desire to possess the Disputed Domain despite the Plaintiff's legitimate right to own it, motivated UDRP Complainant to submit false or misleading statements knowingly and willfully to the WIPO panel concerning confusing similarity, the fame of its mark, and trademark dilution.

130. UDRP Complainant has overreached on its trademark rights and wrongfully asserted a claim to the Disputed Domain.

131. The events described herein constitute reverse domain name hijacking and warrant injunctive relief for Plaintiff under 15 U.S.C. § 1114(2)(D)(iv) and (v).

## COUNT FOUR

## COMMON LAW IN REM RELIEF

132. For in rem jurisdiction to be applicable, five conditions must be applicable; [A.] the property must be *valuable,* [B.] the property must be *located* within the jurisdiction where the court sits at the commencement of the action, [C.] the court must have *control* of the property to the exclusion of the disputing parties, [D.] adequate notice must be provided of the pending action. An opportunity must be provided for all

individuals to be heard according to *due process,* and [E.] substantive due process must be established.

133.    The disputed Domain Name **Solverde.com** is a valuable commodity as it was purchased in the aftermarket for $665.00 and is appraised by GoDaddy Appraisal Tool at $4,416.00.

134.    The domain name is situated within the jurisdiction of this court as it is presently locked by Directnic, LLC, the Registrar, located in Tampa, Florida.

135.    This Court has control of the property to the exclusion of the disputing parties.

136.    All interested parties are notified of this action.

137.    Substantive Due Process is established pursuant to 15 U.S.C. §1124(d).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment:

(a) Declaring that Plaintiff's registration and use of the Disputed Domain "SolVerde.com" is not unlawful under the ACPA, 15 U.S.C. § 1124(d);

(b) Declaring that Plaintiff's registration and use of the Disputed Domain "**SolVerde.com**" does not constitute a bad faith intent to profit from any mark alleged to be owned by UDRP Complainant under the ACPA, 15 U.S.C. § 1124(d);

(c) Declaring that Plaintiff is not required to transfer the registrations for the Disputed Domain "**SolVerde.com**" to UDRP Complainant;

(d) Declaring that the Registrar shall not transfer the registrations for the Disputed Domain "**SolVerde.com**" to UDRP Complainant;

(e) Declaration that UDRP Complainant has engaged in Reverse Domain Hijacking;

(f) An order directing the Registrar to take all actions necessary to enable the domain name **SolVerde.com**; to reactivate the Disputed Domain; to discontinue any suspension of

(f) An order directing the Registrar to take all actions necessary to enable the domain name **SolVerde.com**; to reactivate the Disputed Domain; to discontinue any suspension of the Disputed Domain; and to refrain from transferring the Disputed Domain Name from Plaintiff to UDRP Complainant;

(g) A judgment, order, or injunction enjoining UDRP Complainant from interfering with or challenging Plaintiff's registration, possession, or use of the Disputed Domain;

(h) A judicial declaration that this is an exceptional case under the Lanham Act because UDRP Complainant initiated the UDRP with the bad-faith intent to use the legal system to steal the Domain Name from Plaintiff;

(i) Awarding reasonable attorney's fees and costs and interest to Plaintiff; and

(j) For such other and further relief as the Court shall deem appropriate.


*Attorneys for Plaintiff*

By: _____

HOWARD NEU
Law Office of Howard Neu, P.A.
4839 S.W. Volunteer Road
Suite 512
Southwest Ranches, FL 33330
(954) 662-1816
Florida Bar Number 108689
howard@neulaw.com

*******************

ESQwire.com P.C.
Jason Schaeffer
1908 Route 70 East
Cherry Hill, NJ 08003
(856) 874-9651
jason@ESQwire.com

26

Law.es
Paul Keating
Calle Balmes 173 2/2
08006  Araceli a, Spain
+34 93.368.0247
paul@law.es

JJN Solutions, LLC
Jeffrey Neuman
9445 Brenner Ct.
Vienna VA 22180.
(202) 549-5079
jeff@jjnsolutions.com

DATED:  June 11, 2021